## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

**ALVIN CHRISTOPHER HYMAN, JR.**          **CIVIL ACTION**

**VERSUS**          **NO. 14-1123**

**N. BURL CAIN**          **SECTION "F"(5)**

## REPORT AND RECOMMENDATION

This matter was referred to the undersigned United States Magistrate Judge to conduct a hearing, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. §636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts. Upon review of the entire record, the Court has determined that this matter can be disposed of without an evidentiary hearing. See 28 U.S.C. § 2254(e)(2). For the following reasons, **IT IS RECOMMENDED** that the petition for *habeas corpus* relief be **DISMISSED WITH PREJUDICE**.[1]

### I. *Procedural history*

Petitioner, Alvin Christopher Hyman, Jr., is a state prisoner incarcerated in the

---

[1] Under 28 U.S.C. § 2254(e)(2), whether to hold an evidentiary hearing is a statutorily mandated determination. Section 2254(e)(2) authorizes the district court to hold an evidentiary hearing only when the petitioner has shown either that the claim relies on a new, retroactive rule of constitutional law that was previously unavailable, 28 U.S.C. §2254(e)(2)(A)(i), or the claim relies on a factual basis that could not have been previously discovered by the exercise of due diligence, 28 U.S.C. § 2254(e)(2)(A)(ii); and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner. 28 U.S.C. § 2254(e)(2)(B).

Louisiana State Penitentiary, in Angola, Louisiana.  On September 28, 2006, Hyman was indicted by a Jefferson Parish Grand Jury on one count of second degree murder.[2]  The Louisiana Fifth Circuit Court of Appeal summarized the facts of the case as determined at trial as follows:

> In the early morning hours of August 6, 2006, Leslie Daigrepont was at Alvin C. "Chris" Hyman's apartment when Mr. Hyman accused her of stealing narcotics and money from him. According to Mrs. Daigrepont, Mr. Hyman grabbed her by the throat, threw her to the floor, and attempted to "strip search" her. Mrs. Daigrepont escaped the apartment when someone unexpectedly knocked at Mr. Hyman's front door.
>
> When she returned to her house, Mrs. Daigrepont described the confrontation to her husband, Joshua Daigrepont, and, her brother, Dirk Guidry. Although Mrs. Daigrepont denied Mr. Hyman's accusations while he was questioning her, she admitted to her husband and brother that she had, in fact, stolen narcotics and money from Mr. Hyman earlier that morning.
>
> Later that morning, Mrs. Daigrepont was speaking on the telephone with Leslie Boyer, Mr. Hyman's girlfriend, when Mr. Hyman commandeered the telephone to tell Mrs. Daigrepont that she and her family were "dead." Mrs. Daigrepont's brother, Dirk Guidry, then informed Mr. Hyman that he was coming to Hyman's apartment to "beat his ass." Mr. Hyman accepted the challenge, agreeing to meet Mr. Guidry there. Mr. Guidry and Mr. Daigrepont then drove to Mr. Hyman's residence. Mrs. Daigrepont did not go with her husband and brother.
>
> Joshua Daigrepont confirmed that his wife told him about her confrontation with Hyman. He verified that his wife was talking with Ms. Boyer on the telephone when Hyman threatened his wife and her family. Mr. Daigrepont confirmed that his brother-in-law, Mr. Guidry, retorted that he would be waiting at Hyman's house for him.
>
> Mr. Daigrepont then drove with Mr. Guidry to Hyman's house at about 9:00 a.m.

---

[2] State Rec., Vol. 4 of 10, Grand jury indictment.

They knocked on the door of Mr. Hyman's second floor apartment and shouted for him to open the door. When they received no response, Mr. Daigrepont and Mr. Guidry went downstairs to Sharamie Brewer's apartment, where they waited for about 20 to 30 minutes. As they were leaving Ms. Brewer's apartment, Hyman arrived at the apartment complex.

When Mr. Hyman exited the passenger side of the car, he was holding a gun. Mr. Daigrepont saw the weapon and ducked between parked cars, but Mr. Guidry began yelling at Mr. Hyman.

Mr. Daigrepont testified that Mr. Hyman then raised the gun and pulled the trigger twice, but the weapon failed to discharge. Next, Mr. Hyman turned toward the car and asked an occupant whether there were any bullets in the gun. Hyman then turned back toward Guidry and fired a shot. Immediately, Hyman got back into the car.

Mr. Daigrepont testified that, after Mr. Hyman was in the vehicle, he fired a shot through the car's window at Mr. Daigrepont, who was crouched between parked cars. Mr. Daigrepont was unharmed.

Sharamie Brewer witnessed the shooting from the window of her apartment at 126 Athania Parkway. She heard Mr. Guidry and Mr. Hyman arguing in the parking lot of her apartment complex but she could not make out what they were saying. She saw Mr. Hyman get out of a car, point a gun, and shoot Mr. Guidry.

Debbie Dawson testified that, on August 6, 2006, she lived at 124 Athania Parkway. She knew Mr. Hyman, who lived in the next building at 126 Athania Parkway. At 5:30 a.m. that morning, Ms. Dawson heard loud voices emanating from Mr. Hyman's building but she could not hear what the man and the woman were saying.

Later that morning, Ms. Dawson saw two men, who she did not know, waiting in front of Mr. Hyman's building. She overheard the men talking angrily about a confrontation between Mr. Hyman and the sister of one of the men. Ms. Dawson assumed the fight to which the men were referring was the argument she had heard earlier that morning.

Shortly thereafter, Ms. Dawson, from her second floor bedroom window, saw

3

Mr. Hyman arrive at his apartment complex. He was riding in the passenger seat of a car, other than the one that he usually drove. Mr. Hyman exited the vehicle with a gun in his hand and started shouting at the two men. He challenged the men to "come over here" and to "handle this like a man."

Mr. Hyman then pointed the gun at Mr. Guidry. Ms. Dawson heard the gun click two times then fire. Mr. Guidry fell to the ground immediately. Ms. Dawson called 9–1–1 to report the shooting then attempted to render assistance. Ms. Dawson testified that the altercation happened in less than two minutes.

Devin Doran, who was incarcerated on an unrelated charge at the time of trial, testified that she had known Alvin Hyman for a couple of months before the shooting. On the morning of August 6, 2006, Ms. Doran and her male friend, Tracy, ran into Mr. Hyman as he left a bar. He asked them for a ride home so they drove him to his apartment building. When they arrived, two men were standing in front of the building. Neither of those men had a gun. To her and Tracy's shock, Mr. Hyman got out of the car and shot the "little dude." Mr. Hyman re-entered the car, and told Tracy to drive him to another place, which Tracy did. Ms. Doran testified that she had no further contact with Mr. Hyman.

Leslie Daigrepont, Joshua Daigrepont, Leslie Boyer, Sharamie Brewer, Debbie Dawson, and Devin Doran viewed a photographic lineup provided by the Jefferson Parish Sheriff's Office at separate times. After viewing the lineup, each witness identified defendant, Alvin "Chris" Hyman, as the shooter.

Once Mr. Hyman was identified as a suspect, Deputy Verloin Degruy of the Jefferson Parish Sheriff's Office worked with defendant's cellular telephone company to locate his phone by using a global positioning system (GPS). That information allowed Detective Gorumba to narrow his search for Mr. Hyman to the residence of Mary Spaulding on Elizabeth Avenue.

When the police arrived, Ms. Spaulding gave written consent for police to search her house. The officers located defendant in the rear bathroom and arrested him immediately.

At trial, Mary Spaulding testified that defendant called her that day asking her to pick him up from somewhere in New Orleans. When she picked Hyman up, he was wearing a hat and a wig. Defendant admitted that he shot Mr. Guidry but told Ms. Spaulding that Guidry had pulled a gun on him and was going to shoot

4

him. During the search of Spaulding's house, Detective Gorumba recovered a brown wig.

Several police officers involved in the homicide investigation testified for the State at trial. Sergeant Billy Lewis identified a tape recording of the 9–1–1 call associated with the homicide. The recording was played for the jury. Sergeant Lewis verified that the call was initiated at 8:42 a.m., and the first police unit arrived at the scene at 8:47 a.m.

Detective Timothy Anclade was a patrolman with the Jefferson Parish Sheriff's Office on August 6, 2006, who was dispatched to 126 Athania in Metairie at 8:44 a.m. on that date. When he arrived at the scene five minutes later, he found a white man lying on his back in the parking lot. Detective Anclade secured the scene. Next, he interviewed a witness who said a vehicle pulled up, someone exited the vehicle, shot the victim, and left in the same vehicle. The witness gave Anclade the shooter's name, which Anclade passed on to the homicide division.

On August 6, 2006, Captain Steve Buras was assigned to the Persons Division, which investigates homicides, robberies, and rapes. At the crime scene, Captain Buras recovered a spent .9 mm cartridge casing in the parking lot, 45 to 50 feet south of where the body was discovered, and a cellular telephone and a baseball cap.

Sergeant Donald Meunier, a homicide investigator, walked the perimeter of the murder scene and found no other ballistic evidence. Detective Meunier prepared a search warrant for defendant's apartment at 126 Athania Parkway, Apartment C. However, no firearms were recovered.

Dr. Fraser Mackenzie, an expert in pathology and forensic pathology, performed an autopsy on Dirk Guidry's body. Dr. Mackenzie determined that Dirk Guidry's death was a homicide caused by a gunshot wound to the chest that perforated the left lung and heart and lodged in the victim's back. Dr. Mackenzie recovered the bullet and turned it over to a Jefferson Parish Crime Scene technician.

Captain Tim Scanlan, the assistant director of the Jefferson Parish Sheriff's Office Crime Lab, is an expert in tool mark examination, crime scene reconstruction, trace analysis, forensic science, and crime scene processing. He examined the lead projectile recovered from the victim and the spent bullet casing. He determined that the projectile had a lead core that was consistent

with .38 caliber class ammunition and the spent casing was consistent with the same class of ammunition.

Furthermore, Captain Scanlan testified that a gunshot residue test was performed on the victim's hands in order to determine whether he had handled or discharged a gun. The test produced a negative result. Toxicology tests of Dirk Guidry's blood revealed marijuana, cocaine, morphine, hydrocodone, and 6–0–monoacetylmorphine.

At trial, defendant called Leslie Boyer to testify. Ms. Boyer testified that she had known Dirk Guidry since high school. On the morning of the shooting, she was involved in telephone conversations with Alvin Hyman, Leslie Daigrepont, and Dirk Guidry. Ms. Boyer testified that Mr. Hyman did not threaten Mrs. Daigrepont or her family during those conversations. Further, Ms. Boyer initiated a three-way call between Mr. Hyman and Mr. Guidry. According to Ms. Boyer, during that conversation, Mr. Guidry informed them that he was waiting at Hyman's house with a gun. Ms. Boyer also reported that, according to Mr. Hyman, while they were arguing in front of his house, he saw Mr. Guidry lift his shirt and thought Mr. Guidry was pulling a gun from his waistband.

Edward "Eddie" Guy, a licensed investigator, also testified on defendant's behalf. He stated that he went to the scene to measure pertinent distances. Mr. Guy noted that there is a dumpster next to the driveway of the apartment complexes that would have obscured the view of the murder scene from Sharamie Brewer's first floor apartment.[3]

On January 15, 2009, a jury found Hyman guilty of manslaughter.[4]  On March 6, 2009, he was sentenced to a term of forty (40) years imprisonment.[5]  On that same date, he filed a motion for appeal.

---

[3] *State v. Hyman*, 09-409 (La. App. 5th Cir. 2/9/10), 33 So.3d 271, 274-77.

[4] State Rec., Vol. 3 of 10, Minute entry of January 15, 2009; *see also* Jury Verdict.

[5] *Id.*, Minute entry of March 6, 2009.

The state subsequently filed an habitual offender bill of information charging him as a second felony offender.[6]  On January 6, 2010, the trial court adjudicated Hyman as a second felony offender, vacated the original sentence and resentenced him to a term of eighty (80) years imprisonment without benefit of probation or suspension of sentence.[7]  Hyman appealed this sentence.

On February 9, 2010, the Louisiana Fifth Circuit Court of Appeal affirmed his conviction and original forty-year sentence.[8]  On March 10, 2010, Hyman filed a related writ application with the Louisiana Supreme Court.[9]  That writ application was denied on October 1, 2010.[10]

On February 15, 2011, the Louisiana Fifth Circuit Court of Appeal affirmed his eighty-year multiple offender sentence.[11]  On March 17, 2011, Hyman filed a related writ application with the Louisiana Supreme Court.[12]  That writ application was denied on September 30,

---

[6] State Rec., Vol. 3 of 10, Multiple Offender Bill of Information filed June 12, 2009.

[7] State Rec., Vol. 3 of 10, Minute entry for multiple bill hearing held January 6, 2010.

[8] *State v. Hyman*, 09-409 (La. App. 5th Cir. 2/9/10), 33 So.3d 271; State Rec., Vol. 10 of 10, Tab 9.

[9] State Rec., Vol. 10 of 10, Tab 8, Louisiana Supreme Court writ application 10-K-548.

[10] *State v. Hyman*, 2010-0548 (La. 10/1/10), 45 So.3d 1094, State Rec., Vol. 10 of 10, Tab 7.

[11] *State v. Hyman*, 10-335 (La. App. 5th Cir. 2/15/11), 62 So.3d 146, State Rec., Vol. 10 of 10, Tab 11.

[12] State Rec., Vol. 10 of 10,  Tab 10-A, Louisiana Supreme Court writ application 11-K-0558.

2011.[13]

On November 30, 2012, Hyman's counsel of record filed an application for post-conviction relief with the state district court.[14]   On April 4, 2013, the state district court denied relief.[15]  His related writ application filed with the Louisiana Fifth Circuit Court of Appeal was denied on May 31, 2013.[16]  On June 28, 2013, he filed an application for a supervisory writ of review with the Louisiana Supreme Court.[17]  That supervisory writ application was denied on April 17, 2014.[18]

On May 16, 2014, Hyman's counsel of record filed this federal application for *habeas corpus* relief.[19]  In his petition, Hyman asserts the following grounds for relief:  (1) the State's evidence was not sufficient to refute the theory of self-defense;  (2) the State withheld

---

[13] *State v. Hyman*, 2011-0558 (La. 9/30/11), 71 So.3d 282, State Rec., Vol. 10 of 10, Tab 10.

[14] State Rec., Vol. 2 of 10, Tab 5, Application for post-conviction relief filed November 30, 2012.

[15] State Rec., Vol. 1 of 10, Tab 3.

[16] State Rec., Vol. 1 of 10, Tab 2, *Hyman v. State*, 13-378 (La. App. 5th Cir. 5/31/13) (unpublished writ ruling).

[17] State Rec., Vol. 10 of 10, Tab 13, Louisiana Supreme Court writ application 13-KP-1531.

[18] *Hyman v. State*, 2013-1531 (La. 4/17/14), 138 So.3d 616, State Rec., Vol. 10 of 10, Tab 12.

[19] Rec. Doc. No. 1, Petition for writ of *habeas corpus* filed on May 16, 2014.

exculpatory evidence in violation of *Brady v. Maryland*; (3) his sentence was unconstitutionally excessive; and (4) counsel rendered ineffective assistance in failing to (a) call defense witnesses capable of testifying to the deceased's history of violent behavior; (b) subpoena records that would have served as impeachment evidence and supported his theory of self-defense; and (c) introduce mitigation evidence at sentencing.

The State concedes that Hyman has exhausted his state court remedies, but argues that his federal petition is untimely. For the following reasons, the Court finds the instant petition is timely.

## II. *Discussion*

A. *Timeliness*

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") established a one-year statute of limitations for the filing of federal *habeas corpus* applications. *See* 28 U.S.C. § 2244(d)(1) (West 2013), as amended by the AEDPA, P.L. 104–132, 110 Stat. 1220.[20] The

---

[20] Title 28 U.S.C. § 2244(d) provides:

(1) A 1–year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitations period shall run from the latest of—
(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State actions;
(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized

State argues that Hyman failed to bring his federal petition within one year of the date on which his underlying criminal judgment became final.  28 U.S.C. § 2244(d)(1)(A).

The parties agree that Hyman's conviction became final, for federal limitations purposes, on December 29, 2011, after the 90-day deadline had passed for filing a writ of *certiorari* with the U.S. Supreme Court.[21]  Under a plain reading of the statute, Hyman then had one year within which to file his federal *habeas* petition.  The AEDPA statute of limitations began to run on December 30, 2011.  On November 30, 2012, when Hyman's counsel filed the state post-conviction application, 336 days of untolled time for filing a federal petition had elapsed.  The parties do not dispute that the AEDPA limitations period was then tolled again until Hyman's state post-conviction proceedings concluded and the Louisiana Supreme Court issued its writ denial on April 17, 2014.  The AEDPA statute of limitations began to run again and Hyman's counsel filed the federal petition in this Court 29 days later, on May 16, 2014.  Because the Court rejects the assertion that the petition should be dismissed as untimely, it now turns to a consideration of the merits.

---

by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

[21] See Sup.Ct.R. 13; see also Ott v. Johnson, 192 F.3d 510, 513 (5th Cir.1999). In this case, the 90 days commenced with the Louisiana Supreme Court's denial of certiorari on September 30, 2011 and ended on December 29, 2011 with the expiration of the deadline for filing a request for writ of certiorari with the U.S. Supreme Court.

B. *Standards of review on the merits*

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal *habeas corpus* legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for pure questions of fact, pure questions of law, and mixed questions of both. The amendments "modified a federal *habeas* court's role in reviewing state prisoner applications in order to prevent federal *habeas* 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

As to pure questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *see also* 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of *habeas corpus* by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law or mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Courts have

11

held that the "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning." *Bell*, 535 U.S. at 694.

A state-court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the United States Supreme Court's cases or if the state court confronts a set of facts that are materially indistinguishable from a decision of the United States Supreme Court and nevertheless arrives at a result different from United States Supreme Court precedent. *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000); *Wooten v. Thaler*, 598 F.3d 215, 218 (5th Cir.), *cert. denied*, 131 S.Ct. 294 (2010). An "unreasonable application" of [United States Supreme Court] precedent occurs when a state court "identifies the correct governing legal rule... but unreasonably applies it to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 407-08; *White v. Woodall*, 134 S.Ct. 1697, 1706 (2014).

It is well-established that "an unreasonable application is different from an incorrect one." *Bell*, 535 U.S. at 694. A state court's merely incorrect application of Supreme Court precedent simply does not warrant *habeas* relief. *Puckett v. Epps*, 641 F.3d 657, 663 (5th Cir.2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable."). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable" under the AEDPA." *Harrington v. Richter*, 562 U.S. 86 (2011). Section 2254(d) preserves authority to issue the writ in cases where there is

12

"*no possibility* fairminded jurists could disagree that the state court's decision conflicts with [United States Supreme Court] precedents." *Harrington v. Richter*, 562 U.S. at 102; emphasis added); *see also Renico v. Lett*, 559 U.S. 766, 130 S.Ct. 1855, 1866 (2010) ("AEDPA prevents defendants—and federal courts—from using federal *habeas corpus* review as a vehicle to second-guess the reasonable decisions of state courts.").

C. *Petitioner's Claims*

   1. *Sufficiency of the evidence*

Hyman contends the evidence presented at trial was not sufficient for the State to satisfy its burden of negating his self-defense claim.  Hyman raised his insufficient evidence claim on direct appeal, and after reviewing the record and the parties' briefs, the Louisiana Fifth Circuit Court of Appeal concluded that the State met its burden of proving, beyond a reasonable doubt, that Hyman did not act in self-defense.  Specifically, the court found:

> The constitutional standard for testing the sufficiency of evidence, as enunciated in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), requires that a conviction be based on proof sufficient for any rational trier-of-fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt. The question of sufficiency of the evidence is properly raised in a motion for post-verdict judgment of acquittal. *State v. Pearson*, 07–332, p. 12 (La. App. 5 Cir. 12/27/07), 975 So.2d 646, 653.

> In this case, defendant was convicted of manslaughter under La. R.S. 14:31. La. R.S. 14:31(A)(1) provides, in pertinent part, that manslaughter is:

> A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient

to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed.

On appeal, defendant does not deny that he shot Dirk Guidry, but insists that he acted in self-defense. Accordingly, defendant does not argue that the State failed to prove the elements of manslaughter but he maintains that the prosecution failed to prove, beyond a reasonable doubt, that the homicide was not in self-defense.

When a defendant in a homicide prosecution claims self-defense, the burden is on the State to prove beyond a reasonable doubt that the defendant did not act in self-defense. *State v. Brown*, 414 So.2d 726, 728 (La.1982); *State v. Theriot*, 07–71, p. 13 (La. App. 5 Cir. 6/26/07), 963 So.2d 1012, 1020, *writ denied*, 07–1598 (La. 2/1/08), 976 So.2d 715. According to La. R.S. 14:20(1), a homicide is justifiable "[w]hen committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger."

The determination of a defendant's culpability rests on a two-fold test: 1) whether, given the facts presented, the defendant could reasonably have believed his life to be in imminent danger; and 2) whether deadly force was necessary to prevent the danger. *Theriot*, 07–71 at 12, 963 So.2d at 1020. "'[T]he lack of a weapon is not dispositive of the issue of self-defense, because it is the reasonableness of the apprehension and not the actuality of danger that determines the question of self-defense under La. R.S. 14:20.' " *Theriot*, *supra*, quoting *State v. Patorno*, 01–2585, p. 11 (La.App. 1 Cir. 6/21/02), 822 So.2d 141, 148.

The jury is the ultimate fact-finder in determining whether a defendant proved his condition and whether the State negated the defense beyond a reasonable doubt. *Theriot*, *supra*. The trier-of-fact shall evaluate the witnesses' credibility, and when faced with a conflict in testimony, is free to accept or reject, in whole or in part, the testimony of any witness. *State v. Singleton*, 05–622, p. 7 (La. App. 5 Cir. 1/31/06), 922 So.2d 647, 651. It is not the function of the appellate court to assess the credibility determinations of the trier of fact or to reweigh the evidence. *Id.*

14

In the instant case, defendant offered Leslie Boyer's testimony to show that he did not threaten Mr. Guidry or the Daigreponts over the telephone but that the victim actually threatened him. On cross-examination, however, Ms. Boyer admitted that she told police she heard defendant tell Mrs. Daigrepont, " 'I'm going to get you, b* * *h. I'm going to get you, you wait and see. You stole my coke.' "[22]

Conversely, Mrs. Daigrepont stated that, while they were on the telephone, she did not hear Mr. Guidry say anything to defendant about a weapon. Joshua Daigrepont testified that he did not hear Mr. Guidry say anything to defendant over the telephone about a gun.

Mr. Daigrepont further testified that Mr. Guidry did not bring a gun to Mr. Hyman's apartment. Daigrepont testified that Mr. Guidry did not have a gun at all on the day of the incident. Furthermore, Mr. Daigrepont did not see a gun anywhere around Mr. Guidry after he was shot. He reiterated that he and Mr. Guidry planned only to fist-fight with defendant that day.

As defendant points out, both Mr. and Mrs. Daigrepont have criminal records and asserts that the couple's testimony was unreliable, and not believable. As this Court has noted many times, however, questions of credibility are within the purview of the jury and it is not our function to assess the credibility determinations of the trier of fact or to reweigh the evidence. *State v. Singleton*, supra.

Furthermore, even if the jury did not rely on the Daigreponts' testimony, there were at least three other witnesses whose testimony disproved defendant's self-defense claim. Devin Doran, who drove defendant to the scene of the shooting, testified that no words were exchanged between defendant and the two men that were waiting for him at his apartment complex; defendant simply got out of her car and shot one of the man[sic]. Ms. Doran did not see either the victim or the other man holding a gun, and defendant did not tell her that either of the men had a gun.

Sharamie Brewer, who witnessed the shooting from her apartment window,

---

[22] Ms. Boyer stated that she did not consider that statement to be a threat (footnote in original).

testified that she did not see Mr. Guidry or Mr. Daigrepont with a gun when they were waiting for defendant near her apartment. She also testified that she did not see Dirk Guidry with a firearm at the time of the shooting.

Debbie Dawson also witnessed the shooting from her nearby apartment. Prior to defendant's arrival at the scene, Ms. Dawson heard Mr. Guidry and Mr. Daigrepont talking. They appeared to be angry about the confrontation between defendant and Mrs. Daigrepont. Nevertheless, when defendant arrived in the parking lot, he was the one who acted in a confrontational manner. According to Ms. Dawson, defendant shouted at Guidry and Daigrepont to "come over here" and "handle this like a man." Ms. Dawson testified that defendant pointed his gun at Mr. Guidry and pulled the trigger twice before it actually fired, which incidentally specifically corroborates Mr. Daigrepont's testimony.

Ms. Dawson stated that she did not see Mr. Guidry or Mr. Daigrepont with a gun that morning. Moreover, when Ms. Dawson attempted to give Mr. Guidry medical assistance after the shooting, she did not see a gun near his body.

Detective Anclade, the first police officer to arrive at the scene, testified he did not see a weapon on or near the victim's body. Finally, none of the witnesses testified that Mr. Guidry attempted to attack defendant.

Based [sic] the foregoing testimony, we find that the State met its burden of proving, beyond a reasonable doubt, that defendant did not act in self-defense. Accordingly, we find no merit in these assignments of error.[23]

The Louisiana Supreme Court denied relief without assigning additional reasons.[24]

A claim of insufficient evidence presents a mixed question of law and fact. *Perez v. Cain*, 529 F.3d 588, 594 (5th Cir.2008); *Maes v. Thomas*, 46 F.3d 979, 988 (10th Cir.1995). Therefore, this Court must examine whether the state court's denial of relief was contrary to or an

---

[23] *State v. Hyman*, 09-409 (La. App. 5th Cir. 2/9/10), 33 So.3d 271, 277-79.

[24] *State v. Hyman*, 2010-0548 (La. 10/1/10), 45 So.3d 1094.

unreasonable application of United States Supreme Court precedent.

Claims of insufficient evidence are to be analyzed pursuant to the standard set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979), which held that "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt." *Id.* at 319; *see also Williams v. Cain*, 408 F. App'x 817, 821 (5th Cir.2011); *Perez*, 529 F.3d at 594. The Court's consideration of the sufficiency of the evidence extends only to what was presented at trial. *See McDaniel v. Brown*, 558 U.S. 120, 131, 130 S.Ct. 665, 672 (2010) (recognizing that a reviewing court must consider the trial evidence as a whole under *Jackson*); *Johnson v. Cain*, 347 F. App'x 89, 91 (5th Cir.2009) (*Jackson* standard relies "upon the record evidence adduced at the trial") (*quoting Jackson*, 443 U.S. at 324).

Review of the sufficiency of the evidence, however, does not include review of the weight of the evidence or the credibility of the witnesses, because those determinations are within the exclusive province of the jury. *United States v. Young*, 107 F. App'x 442, 443 (5th Cir.2004) (*citing United States v. Garcia*, 995 F.2d 556, 561 (5th Cir.1993)); *see Jackson*, 443 U.S. at 319 (noting that it is the jury's responsibility "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts"). Thus, all credibility choices and conflicting inferences must be resolved in favor of the verdict. *Ramirez v. Dretke*, 398 F.3d 691, 695 (5th Cir.2005).

A federal *habeas* court is not authorized to substitute its interpretation of the evidence

or its view of the credibility of witnesses in place of the fact-finder. *Weeks v. Scott*, 55 F.3d 1059, 1062 (5th Cir.1995); *Alexander v. McCotter*, 775 F.2d 595, 598 (5th Cir.1985).   In addition, "[t]he *Jackson* inquiry 'does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit.'" *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir.2001) (*quoting Herrera v. Collins*, 506 U .S. 390, 402 (1993)).   Moreover, because the state court's decision applying the already deferential *Jackson* standard must be assessed here under the strict and narrow standards of review mandated by the AEDPA, the standard to be applied by this Court is in fact "twice-deferential." *Parker v. Matthews*, 132 S.Ct. 2148, 2152 (2012); *see also Coleman v. Johnson*, 132 S.Ct. 2060, 2062 (2012).

Though indicted on a charge of second degree murder, the jury found Hyman guilty of the lesser offense of manslaughter.   Hyman does not dispute that the State proved the elements of manslaughter.   He concedes, as he did in the state courts, that he killed the victim. The focus of his challenge is that the State failed to disprove that he acted in self-defense.   In his supporting memorandum, he maintains that he fired the fatal shot only in self-defense, "not only because of [the victim's] repeated threats, aggressive confrontation, and known violent propensities, but also after [the victim] brandished a firearm at Petitioner in the parking lot of Petitioner's apartment residence where [the victim] and an accomplice lay in wait for

Petitioner."[25]

Louisiana law provides that a homicide is justifiable when committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger. La. R.S. 14:20(A)(1). The State had the burden of proving that Hyman did not act in self-defense. *State v. Theriot*, 07–71, p. 13 (La. App. 5 Cir. 6/26/07), 963 So.2d 1012, 1020, *writ denied*, 07–1598 (La. 2/1/08), 976 So.2d 715. The standard of review on federal *habeas* review under *Jackson* is whether a rational trier of fact, after viewing the evidence in the light most favorable to the prosecution, could find beyond a reasonable doubt that the homicide was not committed in self-defense or the defense of others.

The evidence was sufficient for the jury reasonably to reject Hyman's self-defense argument. As Hyman concedes, the only support for his argument that the victim brandished a firearm at the scene of the crime is his own supposition. He claims that no one else saw the victim's weapon and that it was later removed and hidden by the victim's brother-in-law following the incident. But despite his self-serving speculation, Hyman concedes that the "State is correct in its repeated noting that no evidence of [the victim's] gun possession was found at the scene or admitted at trial."[26] In fact, the record is devoid of any evidence that the

---

[25] Rec. Doc. 1-1, Memorandum in support, pp. 12-13.

[26] Rec. Doc. No. 15, p. 12.

victim was armed.  The police detectives who testified at trial regarding their detailed criminal investigation confirmed that no weapon was found on or near the victim or recovered from the crime scene.  Additionally, a gunshot residue test performed on the victim came back negative.       Furthermore, there was no eyewitness testimony that the victim had a gun in his possession on the day of the shooting.  By all accounts, the victim and Mr. Daigrepont were unarmed when Hyman exited the vehicle with his gun and began yelling at them.   Thus, not a single witness saw the victim or Mr. Daigrepont with a gun on the day of the shooting.  And no witness testified that the victim or Mr. Daigrepont initiated the attack on Hyman.

The court of appeal noted that in addition to the Daigreponts' testimony, the jury could have found persuasive at least three other eyewitnesses, Doran, Brewer, and Dawson, whose testimony disproved Hyman's self-defense claim.   All three eyewitnesses similarly testified that neither the victim nor Mr. Daigrepont was armed.  Their testimony further established that Hyman shot the victim at a point and under circumstances where Hyman's life was not in imminent danger and where deadly force was not necessary to prevent the danger.

The testimony at trial regarding Hyman's actions following the shooting also disproved his self-defense claim.  Hyman did not remain at the scene of the crime to wait for the police to arrive.  Instead, he immediately fled the scene, donned a disguise and evaded police until they tracked him through his cell phone.[27]

---

[27] State Rec., Vol. 6 of 10, Tr. pp. 346-47 (Mary Spaulding).

It bears repeating here that this Court must defer to the trier of fact with respect to issues of conflicting testimony, weight of the evidence, and the credibility of the witnesses. *Jackson*, 443 U.S. at 319; see also *Schlup v. Delo*, 513 U.S. 298, 330, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995) ("[U]nder *Jackson*, the assessment of the credibility of witnesses is generally beyond the scope of review."); *Ramirez v. Dretke*, 398 F.3d 691, 695 (5th Cir. 2005). The jury considered and weighed the evidence in this case which showed that Hyman was angered by his earlier dealings with the victim, armed himself with a gun, aggressively confronted the victim and Mr. Daigrepont who were both unarmed, and repeatedly fired the weapon until he shot the victim dead. The record as a whole contains more than sufficient evidence for the State to have disproved Hyman's allegation of self-defense.

For the reasons noted by the state court, the evidence in this case, viewed in the light most favorable to the prosecution, was sufficient for any rational trier of fact to find that Hyman did not act in self-defense. Therefore, Hyman cannot show that the state court's decision rejecting his claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. He is not entitled to relief on this claim.

2. *Suppression of evidence*

Hyman contends the State improperly suppressed impeachment evidence related to the State's witness, Joshua Daigrepont, in violation of *Brady v. Maryland*. Hyman raised this issue on direct appeal, arguing that his due process rights were violated by the State's failure

to provide him before trial exculpatory evidence regarding Joshua Daigrepont's prior guilty

pleas.  Specifically, he asserted that the State failed to inform him that Mr. Daigrepont had a

felony escape charge *nolle prossed* in December 2008 and that he pled guilty to possession of

heroin and felony theft in December 2008 with the State's assurance that he would not be

multiple billed for either conviction.  In rejecting these claims on direct appeal, the Louisiana

Fifth Circuit explained:

> In *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the
> United States Supreme Court held that the suppression by the prosecution of
> evidence favorable to the accused after receiving a request for it violates a
> defendant's due process rights where the evidence is material either to guilt or
> punishment, without regard to the good or bad faith of the prosecution. *Id.*, 373
> U.S. at 87, 83 S.Ct. at 1196–97. The *Brady* rule includes evidence which
> impeaches the testimony of a witness when the reliability or credibility of that
> witness may be determinative of guilt or innocence. *United States v. Bagley*, 473
> U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985); *Giglio v. United
> States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); *State v.
> Knapper*, 579 So.2d 956, 959 (La.1991).
>
> Regardless of whether there is a request, favorable evidence is material, and
> constitutional error results from its suppression by the government, "if there is
> a reasonable probability that, had the evidence been disclosed to the defense,
> the result of the proceeding would have been different." *Kyles v. Whitley*, 514
> U.S. 419, 433–34, 115 S.Ct. 1555, 1565, 131 L.Ed.2d 490 (1995) (*citing Bagley*,
> 473 U.S. at 682, 105 S.Ct. at 3383). Bagley's touchstone of materiality is a
> "reasonable probability" of a different result.
>
> The question is not whether the defendant would more likely than not have
> received a different verdict with the evidence, but whether, in its absence, he
> received a fair trial, understood as a trial resulting in a verdict worthy of
> confidence. A "reasonable probability" of a different result is shown when the
> State's evidentiary suppression "undermines confidence in the outcome of the
> trial." *Kyles*, 514 U.S. at 434, 115 S.Ct. at 1566; *Bagley*, 473 U.S. at 678, 105 S.Ct.
> at 3381.

Here, in his pre-trial motions, defendant requested exculpatory evidence from the State. In response, the State provided the defense with information regarding Mr. Daigrepont's (and other witnesses) criminal history. Specifically, the State reported, "Mr. Daigrepont was not offered any plea bargain in exchange for his testimony in this case."

At trial, Joshua Daigrepont testified that he was currently serving a four-year sentence for (1) possession of heroin, (2) felony theft, (3) resisting arrest, and (4) possession of drug paraphernalia. Mr. Daigrepont testified that the instant resisting arrest conviction resulted from the original 2006 simple escape charge. He also admitted that he had a 1995 conviction for possession with intent to distribute marijuana.

On cross-examination, Mr. Daigrepont further admitted to convictions for (1) disturbing the peace in 1995 and (2) a marijuana charge involving Dirk Guidry in 1995. When questioned about the felony theft charge to which he pled guilty a month prior to the instant trial, Mr. Daigrepont testified that he had received a two-year sentence for that offense, and that he was not multiple billed.

At the conclusion of Mr. Daigrepont's testimony, defense counsel moved for a mistrial. Counsel argued that he had specifically asked the State about any deals made with witnesses for their testimony, and the State misinformed him because, in December 2008, Mr. Daigrepont had not been multiple-billed on his theft or heroin charges and a felony escape charge against him had been nolle prossed.

The prosecutor responded that he provided defense counsel with Mr. Daigrepont's local, state, and FBI "rap sheets" and Mr. Daigrepont's recent guilty pleas to possession of heroin, possession of drug paraphernalia, and theft of goods. The prosecutor reiterated that Mr. Daigrepont had not been offered any plea bargains in exchange for his testimony at the murder trial.

Furthermore, Jeff Hand, a former Jefferson Parish Assistant District Attorney, testified thereafter that he was the assistant district attorney involved in Mr. Daigrepont's most recent guilty pleas. He stated that he chose not to multiple-bill Mr. Daigrepont because the previous felonies were almost ten years old and the district attorney's office must use its discretion in order to move cases. Mr. Hand stated that Mr. Daigrepont's guilty pleas were not associated with the murder case. Had that been the case, he would not have

allowed Mr. Daigrepont to plead guilty and be sentenced before he had testified in this case. Furthermore, he understood that because Mr. Daigrepont was related to the victim in the murder case, he would have a compelling reason to testify without the offer of a deal from the State. The trial judge denied defendant's motion for mistrial and subsequent motion for new trial on this basis.

Here, we find that the State adequately complied with the requirements of *Brady*. First, the record reveals that the State turned over the criminal histories requested by the defense, including Mr. Daigrepont's latest guilty pleas. Second, as defense counsel demonstrated at trial, further information on the State's witnesses was readily available from the Jefferson Parish Clerk of Court.[28] Third, the former prosecutor testified that he did not make a deal with Mr. Daigrepont in exchange for testimony in this case; he chose not to multiple bill Mr. Daigrepont for reasons unrelated to this case. Finally, defense counsel, in an attempt to discredit Mr. Daigrepont, thoroughly cross-examined him about his prior convictions and any deals that he could have made with the State. Upon review, we find that the trial judge did not err in denying defendant's motion for mistrial or motion for new trial.[29]

Under the AEDPA, this Court must decide whether the state court's determination resulted in a decision that is contrary to, or involved an unreasonable application of, clearly established federal law." *Dickson v. Quarterman*, 462 F.3d 470, 477-78 (5th Cir.2006).

In *Brady v. Maryland*, the Supreme Court held that "the suppression by the prosecution

---

[28] The Louisiana Supreme Court has found " '[t]here is no *Brady* violation where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence is available from another source, because in such cases there is really nothing for the government to disclose.' " *State v. Hobley*, 99–3343, p. 25, n. 10 (La.12/8/99), 752 So.2d 771, 786, *cert. denied,* 531 U.S. 839, 121 S.Ct. 102, 148 L.Ed.2d 61 (2000), *quoting Coe v. Bell*, 161 F.3d 320, 344 (6th Cir.1998). *See also, State v. Kenner*, 05–1052 (La.12/16/05), 917 So.2d 1081 (per curiam) (footnote in original).

[29] *State v. Hyman*, 09-409 (La. App. 5th Cir. 2/9/10), 33 So.3d 271, 280-82.

of evidence favorable to an accused ... violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). To establish a *Brady* violation, the Fifth Circuit requires the defendant to prove that "(1) the prosecution suppressed evidence, (2) the evidence was favorable to the defense, and (3) the evidence was material to his guilt or punishment." *Cobb v. Thaler*, 682 F.3d 364, 377 (5th Cir.2012). The remedy for a *Brady* violation is a new trial. *United States v. Brown*, 650 F.3d 581, 588-89 (5th Cir.2011). In *Giglio v. United States*, 405 U.S. 170 (1972), the Supreme Court extended the *Brady* rule to impeachment evidence. *Matthew v. Johnson*, 201 F.3d 353, 360 (5th Cir.2000).

Initially, evidence is not considered suppressed if the defendant "knows or should know the essential facts that would enable him to take advantage of it." *United States v. Runyam*, 290 F.3d 223, 246 (5th Cir.2002) (internal citations omitted); *see also United States v. Brown*, 628 F.2d 471, 473 (5th Cir.1980) ("[W]hen information is fully available to a defendant at the time of trial and his only reason for not obtaining and presenting the evidence to the Court is his lack of reasonable diligence, the defendant has no *Brady* claim.").

Furthermore, evidence that was suppressed must be shown to be favorable to the accused. *United States v. Sipe*, 388 F.3d 471, 477 (5th Cir.2004). "Any understanding or agreement as to a future prosecution would be relevant to [the witness's] credibility and the jury is entitled to know of it." *Giglio*, 405 U.S. at 155. Thus, under *Brady* and *Giglio*, the prosecution is obligated to disclose any expectation of leniency that a trial witness anticipates

25

in exchange for his testimony. *See generally Tassin v. Cain*, 517 F.3d 770 (5th Cir.2008). This disclosure obligation exists even when there is no "firm promise" of leniency. *Id*. at 777.

Nevertheless, a petitioner must offer sufficient evidence that a witness received leniency or anticipated receiving leniency from the State. In *Madellin v. Dretke*, the Fifth Circuit dismissed a *Brady* claim because the petitioner failed to demonstrate that an agreement existed between the State and one of the State's witnesses. 371 F.3d 270,281 (5th Cir.2004). The petitioner alleged the State had promised a witness that his misdemeanor charge would be dismissed if he and his wife testified during the petitioner's trial. *Id*. Even though the misdemeanor charges against the witness were eventually dropped, the Fifth Circuit found that the petitioner's claim rested on a "substantial degree of speculation" and that there was insufficient evidence to show that any agreement existed. *Id*.; *see also Frazier v. Warden La. State Penitentiary*, No. 06–312, 2008 WL 4104521, at *6 (W.D.La. July 10, 2008) (holding that the petitioner failed to adduce sufficient evidence of a deal between the state witness and the prosecutor); *Dowthitt v. Johnson*, 230 F.3d 733, 756 n. 33 (5th Cir.2000) (finding that evidence of the witness's lenient sentence was not sufficient, by itself, to demonstrate that a deal existed between the witness and the State).

Finally, in order to establish prejudice under *Brady*, the defendant must show that the suppressed evidence is material to the defendant's guilt. *Martin v. Cain*, 246 F.3d 471, 477 (5th Cir.2001). Evidence is material under *Brady* if it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514

U.S. 419, 434–35, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *Rector v. Johnson*, 120 F.3d 551, 562 (5th Cir.1997). Instead, there must be a "reasonable probability of a different result." *Kyles*, 514 U.S. at 434.

When evaluating the materiality of impeachment evidence, a court must consider "the nature of the impeachment evidence improperly withheld and the additional evidence of the defendant's guilt independent of the disputed testimony." *Wilson v. Whitley*, 28 F.3d 433,439 (5th Cir.1994). Impeachment evidence is material if it "would seriously undermine the testimony of a key witness on an essential issue" or demonstrate lack of corroboration. *United States v. Weintraub*, 871 F.2d 1257, 1262 (5th Cir.1989). Conversely, "when the testimony of the witness who might have been impeached by the undisclosed evidence is strongly corroborated by additional evidence supporting a guilty verdict, the undisclosed evidence generally is not found to be material." *Sipe*, 388 F.3d at 478. Thus, no *Brady* violation occurs when favorable impeachment evidence is merely cumulative of other evidence presented. *Id.*

Hyman has failed to establish that the State suppressed exculpatory evidence in connection with Mr. Daigrepont's criminal history.  The evidence Hyman claims was "suppressed" was in fact adequately disclosed to him.  At the outset, the State's file was made available to the defense, along with initial disclosure of a compact disc containing 322 pages of discovery that included witness "rap sheets."  The State continued to supplement its

disclosures throughout the proceedings to ensure defense counsel was aware of all open attachments on State witnesses.[30]   Prior to trial, the State provided defense counsel with a "Notice of Information" that included copies of local, state and federal "rap sheets" for Mr. Daigrepont and minute entries related to his recent criminal proceedings.[31]   The notice supplied defense counsel with information regarding Mr. Daigrepont's prior criminal convictions, including his December 2008 guilty pleas with the related criminal matter numbers.  The notice also referenced attached minute entries, which the prosecutor explained at trial reflected the State's agreement not to multiple bill Mr. Daigrepont.[32]   Finally, the notice advised defense counsel that the State did not offer Mr. Daigrepont any plea bargains in exchange for his testimony in this case.

The state court record shows that the State provided full disclosure to defense counsel of all the relevant information associated with Mr. Daigrepont's December 2008 guilty plea proceedings.  Based on the information supplied, defense counsel possessed the essential facts surrounding Mr. Daigrepont's 2008 criminal proceedings to enable him to use the information

---

[30] Rec. Doc. No. 12, State's Response at p. 27.  *See e.g.*, State Rec., Vol. 5 of 10, pp. 150-52, 157-58 (pretrial motion hearing).

[31] State Rec., Vol. 7 of 10, Tr. pp. 758-761 (full hearing on motion for mistrial at pp. 753-764); *see also* State Rec., Vol. 8 of 10 (Notice of Information). The notice of information contained in the state court record does not include a copy of the attached documents referenced therein.

[32] *Id*. at 763.

28

at trial.  The state court record in this case plainly refutes Hyman's contention that the State withheld impeachment evidence of Mr. Daigrepont's criminal history.

Hyman implies the evidence suggests a plea agreement or leniency in exchange for Mr. Daigrepont's testimony at trial.  However, Hyman has offered no evidence that Mr. Daigrepont received leniency or anticipated receiving leniency from the State in his 2008 criminal proceedings in exchange for his testimony against Hyman.  In fact, the record overwhelmingly supports an opposite conclusion—no agreement was ever made between the prosecutor and Mr. Daigrepont for his testimony in this case.

The State's Notice of Information expressly advised that Mr. Daigrepont was offered no plea bargain in exchange for his testimony in this case.  As emphasized by the prosecutor at trial, that statement "[was] correct then, and it's correct today."[33]  Additionally, Assistant Attorney General Jeff Hand, the former assistant district attorney who had prosecuted Mr. Daigrepont's cases, testified at trial that the resolution of those criminal charges had no relation whatsoever to Hyman's case.  He made it clear at trial that Mr. Daigrepont was never offered a deal in exchange for his testimony against Hyman.[34] Absent any showing that an agreement ever existed with Mr. Daigrepont and given the State's unrefuted evidence to the contrary, the State cannot be shown to have suppressed such purported evidence in violation

---

[33] State Rec., Vol. 7 of 10, Tr. p. 760.

[34] *Id*. at 792-96.

of *Brady* or Hyman's due process rights.  *See Madellin*, 371 F.3d at 281; *Dowthitt*, 230 F.3d at 756 n. 33; *United States v. Rhines*, 143 F. App'x 478, 484 (3d Cir.2005) (finding that no *Brady* violation had occurred where the evidence sufficiently established that no agreement with a witness existed).

Finally, not only was the information about Mr. Daigrepont's criminal history properly disclosed and available to defense counsel prior to trial, it was brought out at trial and defense counsel had the opportunity to cross-examine Mr. Daigrepont fully regarding the circumstances surrounding his 2008 guilty pleas.[35]  Therefore, the jury was able to consider and weigh this impeachment material in determining Mr. Daigrepont's credibility.

Accordingly, the state court's determination that Hyman failed to establish any violation of the duty to disclose impeaching evidence under *Brady* was neither contrary to nor an unreasonable determination under federal law.  Hyman has not shown that he is entitled to relief on this claim.

3. *Excessive sentence*

Hyman contends the 80–year prison sentence for manslaughter imposed upon him as a second felony offender is unconstitutionally excessive and constitutes cruel and unusual punishment under the Eighth Amendment.  He argues that his sentence is excessive because it is the maximum allowable sentence within the statutory penalty range.

---

[35] State Rec., Vol. 7 of 10 (Daigrepont), Tr. pp. 712-13, 732-44, 853.

The Louisiana Fifth Circuit Court of Appeal rejected this claim on direct review, finding that "the trial court did not abuse its broad discretion in imposing the maximum habitual offender sentence."[36] The court of appeal noted that the facts and evidence supported a second degree murder conviction which carries a life sentence although he was found guilty of the responsive verdict of manslaughter, and that sentences imposed under similar circumstances have been upheld.

Federal *habeas* relief is not available unless the state court decision "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Under this standard of review, this Court must defer to the state court's determination, which is entirely proper under the applicable federal law.

A sentence within statutory limits will not be upset by a federal *habeas* court, unless it is grossly disproportionate to the gravity of the offense. *Harmelin v. Michigan*, 501 U.S. 957, 1001 (1991); *Solem v. Helm*, 463 U.S. 277, 291–92 (1983). "[W]hen a threshold comparison of the crime committed to the sentence imposed leads to an inference of 'gross disproportionality,'" this Court will then consider: (1) the sentences imposed on other criminals in the same jurisdiction and (2) the sentences imposed for commission of the same offense in other jurisdictions. *Smallwood v. Johnson*, 73 F.3d 1343, 1347 (5th Cir.1996)

---

[36] *State v. Hyman*, 10-335 (La. App. 5th Cir. 2/15/11), 62 So.3d 146, 155.

(*quoting Harmelin*, 501 U.S. at 1005) (*citing McGruder v. Puckett*, 954 F.2d 313, 316 (5th Cir.1992)); *United States v. Gray*, 455 F. App'x 448, 449 (5th Cir.2011); *United States v. Thomas*, 627 F.3d 146, 160 (5th Cir.2010), *cert. denied*, 131 S.Ct. 2470 (2011). If the sentence is not "grossly disproportionate" in the first instance, however, the inquiry is finished. *United States v. Gonzales*, 121 F.3d 928, 942 (5th Cir.1997), *overruled in part on other grounds*, *United States v. O'Brien*, 560 U.S. 218, 234–35 (2010) (as recognized in *United States v. Johnson*, 398 F. App'x 964, 968 (5th Cir.2010)). As the Supreme Court has noted, successful proportionality challenges outside the context of capital punishment are "exceedingly rare" and constitutional violations are sustained only in "extreme" or "extraordinary" cases. *Ewing v. California*, 538 U.S. 11, 22 (2003) (quotation and citations omitted); *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quotation and citations omitted).

This is not an extraordinary case where the sentence is unconstitutionally disproportionate to the crime. Hyman's sentence clearly fell within the limits set by the Louisiana legislature. *See United States v. Miknevich*, 638 F.3d 178, 186 (3d Cir.2011) ("Generally, a sentence within the limits imposed by statute is neither excessive nor cruel and unusual under the Eighth Amendment. This is so because we accord substantial deference to [the legislature], as it possesses broad authority to determine the types and limits of punishments for crimes." (citations omitted)). Moreover, when evaluating the excessiveness of a sentence imposed under an habitual offender statute, a court must be mindful that the "sentence is imposed to reflect the seriousness of [petitioner's] most recent offense, not as it

stands alone, but in the light of his prior offenses." *McGruder*, 954 F.2d at 316.

Though he concedes that his sentence fell within the applicable statutory range, Hyman argues that his sentence was too harsh considering that the victim was the principle aggressor and had a more egregious criminal history than his own.  This argument merely attempts to deflect the Court from considering Hyman's actions.  Petitioner completely ignores the serious nature of his crime.  However, the Louisiana Fifth Circuit Court of Appeal set forth factors that sufficiently explained why his sentence of 80 years was proportionate and warranted for this crime:

> The trial judge gave extensive reasons for the sentence imposed. He said he was struck by the defendant's deliberate cruelty in committing the offense. He pointed out that the defendant aimed his gun at the victim and attempted to fire at him. When the gun misfired, the defendant had the opportunity to withdraw from the confrontation, but he did not. The judge also noted that the defendant fired his weapon in a residential neighborhood where others could have been injured.

Given the circumstances of his crime and his 80-year sentence, this case simply does not qualify as a rare situation in which the difference between the crime and the sentence was unconstitutionally disproportionate. *Compare Solem v. Helm*, 463 U.S. 277, 281, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983) (holding that the Eighth Amendment prohibited a life sentence without the possibility of parole for a recidivist offender convicted of "uttering a 'no account' check for $100"), with *Harmelin v. Michigan*, 501 U.S. 957, 961, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) (rejecting a proportionality challenge to a mandatory sentence of life without the possibility of parole imposed on a first-time offender convicted of possessing 672 grams of cocaine), and

*Rummel v. Estelle*, 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980) (rejecting a proportionality challenge where the defendant had been sentenced to life imprisonment under a recidivist statute following his conviction for obtaining $120.75 by false pretenses).

Hyman fails to demonstrate that the adjudication of his excessive sentence claim was contrary to or involved an unreasonable application of clearly established federal law. He is not entitled to relief on this claim.

4. *Ineffective assistance of counsel*

Finally, Hyman contends his counsel rendered ineffective assistance when he failed to introduce sufficient evidence of the victim's violent character (his reputation for violence, and in particular gun violence); investigate and obtain vital records to support Hyman's assertion that the victim was armed; and offer any mitigating evidence during sentencing. He argues the first two deficiencies severely undermined his self-defense claim at trial. Hyman raised these claims in an application for post-conviction relief. By reasoned judgment, the state district court denied relief because petitioner failed to establish either deficient performance or prejudice under *Strickland* with regard to his first two claims, and his claim involving ineffective assistance during sentencing was procedurally barred from review. The ruling was subsequently upheld by the Louisiana Fifth Circuit Court of Appeal and the Louisiana Supreme Court.

34

(a) *Failure to introduce mitigation evidence at sentencing*

Initially, the Court will consider the claim of ineffective assistance of counsel during sentencing, which the state district court found procedurally barred from review. This claim was raised for the first time in his post-conviction relief application and dismissed on state-law procedural grounds pursuant to Louisiana Code of Criminal Procedure article 930.3; *State v. Cotton*, 25 So.3d 1030 (La.2010); and *State ex rel. Melinie v. State*, 665 So.2d 1172 (La.1996), all of which prohibit post-conviction review of sentencing errors, including ineffective assistance of counsel during sentencing. The state district court rendered the last reasoned decision refusing to consider the claim. Presumably, the Fifth Circuit and Louisiana Supreme Court's rulings likewise rested on these same grounds. *See Ylst v. Nunnemaker*, 501 U.S. 797, 802-03 (1991).

Generally, a federal court will not review a question of federal law decided by a state court if the decision of that state court rests on a state ground that is both independent of the federal claim and adequate to support that judgment. *Maples v. Thomas*, 132 S.Ct. 912, 922 (2012); *Walker v. Martin*, 131 S.Ct. 1120, 1127 (2011); *Coleman v. Thompson*, 501 U.S. 722, 731–32 (1991); *Roberts v. Thaler*, 681 F.3d 597, 604 (5th Cir.2012), *cert. denied*, 133 S.Ct. 529 (2012); *Glover v. Cain*, 128 F.3d 900, 902 (5th Cir.1997); *Amos v. Scott*, 61 F.3d 333, 338 (5th Cir.1995). This "independent and adequate state law" doctrine applies to both substantive and procedural grounds and affects federal review of claims that are raised on either direct or *habeas* review. *Finley v. Johnson*, 243 F.3d 215, 218 (5th Cir.2001); *Amos*, 61 F.3d at 338.

35

A procedural restriction is "independent" if the state court's judgment "clearly and expressly" indicates that it is independent of federal law and rests solely on a state procedural bar. *Roberts*, 681 F.3d at 604; *Finley*, 243 F.3d at 218; *Amos*, 61 F.3d at 338. To be "adequate," the state procedural rule must be strictly or regularly followed by the state courts and evenhandedly applied to the majority of similar claims. *Roberts*, 681 F.3d at 604; *Finley*, 243 F.3d at 218; *Glover*, 128 F.3d at 902.  This court has repeatedly held that *State ex rel. Melinie* and Article 930.3 provide independent and adequate state grounds for dismissal, which bar review by the federal courts in a *habeas corpus* proceeding.  *Hull v. Stalder*, 234 F.3d 706, 2000 WL 1598016, at *1 (5th Cir. Sep. 28, 2000) (Table, Text in Westlaw) (art. 930.3, *State ex rel. Melinie*); *Zantiz v.. Louisiana*, No. 12–2908, 2014 WL 775577, at *7 (E.D.La. Feb. 25, 2014) (Engelhardt, J.) (order adopting report); *Johnson v. Cain*, No. 12–0621, 2012 WL 5363327, at *4 (E.D.La. Oct. 30, 2012) (Lemelle, J.) (art. 930.3, *State ex rel. Melinie* and *Cotton*); *Evans v. Cain*, No. 112584, 2012 WL 2565008, at *6–*7 (E.D.La. Mar. 14, 2012), adopted by 2012 WL 2565001, at *1 (E.D.La. Jul. 2, 2012) (Berrigan, J.); *Taylor v. Cain*, No. 07–3929, 2008 WL 4186883, at *16 (E.D.La. Sep. 10, 2008) (Vance, J.) (order adopting report); *Williams v. Cain*, No. 05–0710, 2008 WL 3363562, at *8 (E.D.La. Aug. 8, 2008) (Barbier, J.) (order adopting report).  The bar imposed in this case is both independent and adequate to preclude review of the merits of Hyman's claim of ineffective assistance of counsel during sentencing.

Furthermore, Hyman has not offered any cause for the default which would excuse the procedural bar imposed by the state court.  The record does not support a finding that any

36

factor external to the defense prevented Hyman from raising his claim in a procedurally proper manner. The record also does not reflect any action or inaction on the part of the State that prevented him from doing so. "The failure to show 'cause' is fatal to the invocation of the 'cause and prejudice' exception, without regard to whether 'prejudice' is shown." *Hogue*, 131 F.3d 466, 497 (5th Cir.1997) (*citing Engle v. Isaac*, 456 U.S. 107, 134 n. 43 (1982)).

Hyman's claim is therefore procedurally barred from review by this Court unless he can establish that a fundamental miscarriage of justice will occur if the merits of his claim are not reviewed. No such showing has been made in this case. Hyman does not claim to be actually innocent of the underlying conviction. For these reasons, Hyman has failed to overcome the procedural bar to his claim, which must be dismissed with prejudice for that reason.[37]

(b)-(c) *Failure to introduce evidence of the victim's character and failure to investigate and procure favorable evidence*

As for the remaining two ineffective assistance of counsel claims properly before this Court for a merits review, as correctly noted by the state district court, the United States

---

[37] Hyman alleges generally that the provision of Louisiana law prohibiting post-conviction review of his Sixth Amendment claim that his counsel provided ineffective assistance during sentencing "appears to run contrary to the great weight of U.S. Supreme Court authority." (Rec. Doc. No. 1-1, Memorandum in Support, p. 30). He cites cases for the proposition that an inmate's constitutional right to effective representation during sentencing is well-recognized. (Rec. Doc. No. 15, p. 14). Though Hyman argues that the procedural bar in post-conviction proceedings denies him the right to vindicate his constitutional right to effective representation during sentencing, he cites no federal precedent to support that contention. Furthermore, under Louisiana law, Hyman was not barred from raising this claim on direct appeal.

Supreme Court has established a two-prong test for evaluating claims of ineffective assistance of counsel. A petitioner seeking relief must demonstrate both that counsel's performance was deficient and that the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 697 (1984). A petitioner bears the burden of proof on such a claim and "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective." *Jernigan v. Collins*, 980 F.2d 292, 296 (5th Cir.1993); *see also Clark v. Johnson*, 227 F.3d 273, 284 (5th Cir.2000). If a court finds that a petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e. deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without addressing the other prong. *Strickland*, 466 U.S. at 697.

To prevail on the deficiency prong of the *Strickland* test, a petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment. *See Styron v. Johnson*, 262 F.3d 438, 450 (5th Cir.2001). "Counsel's performance is deficient if it falls below an objective standard of reasonableness." *Little v. Johnson*, 162 F.3d 855, 860 (5th Cir.1998). Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances. *See Strickland*, 466 U.S. at 689. "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.' " *Lockhart v. Fretwell*, 506 U.S. 364, 371 (1993) (quoting *Strickland*, 466 U.S. at 690). A petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation. *See Crockett v. McCotter*, 796 F.2d 787, 791 (5th Cir.1986); *Mattheson v. King*, 751 F.2d 1432, 1441

(5th Cir.1985).

In order to prove prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.* In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial." *Crockett*, 796 F.2d at 793.

As noted, Hyman's ineffective assistance of counsel claim was considered and rejected by the state courts on collateral review. Because such a claim presents a mixed question of law and fact, this Court must defer to the state court decision rejecting his claim unless that decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *Moore v. Cockrell*, 313 F.3d 880, 881 (5th Cir.2002). Moreover, the United States Supreme Court has recognized that, under the AEDPA, federal *habeas corpus* review of an ineffective assistance of counsel claim is in fact doubly deferential. *Harrington v. Richter*, 131 S.Ct. 770, 788 (2011) ("The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so.").

First, Hyman argues that counsel failed to introduce sufficient evidence at trial regarding the victim's character, namely his propensity for violence and in particular gun

violence.  He argues that while Leslie Boyer was called as a defense witness and testified to hearing the victim threaten Petitioner with a firearm, trial counsel was ineffective for failing to elicit *additional* testimony regarding the victim's known violent tendencies and interests in guns.[38]  He also argues that Sherrie Bach, who was not called as a witness, would have testified to facts underlying a 1995 incident in which the victim beat Bach's two-year old stepson.[39]  According to Hyman, this evidence was crucial to establish his justifiable state of mind at the time of the incident to support that he acted in self-defense.  As to this claim, however, Hyman has established neither deficient performance or prejudice.

As Petitioner admits, defense counsel investigated and considered each of these individuals as potential witnesses in this case.[40]  Ultimately, as Hyman notes, defense counsel did not call Bach as a defense witness at trial.  Under *Strickland*, decisions by counsel as to whether to call or question witnesses may be considered matters of trial strategy.  *Strickland,* 466 U.S. at 690-91; *see also Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985).  "A conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Garland v. Maggio*, 717 F.2d 199, 206 (5th Cir.1983).  The

---

[38] Rec. Doc. 1-8, Affidavit of Leslie Boyer.

[39] *Id*., Affidavit of Sherrie Bach.

[40] Rec. Doc. 1-1, p. 23.

Court finds this simply is not the case here.  Counsel made a reasonable tactical decision not to call Bach as a witness.  Hyman has not demonstrated that Bach's testimony about an unrelated incident of alleged child abuse that occurred over a decade before this shooting was relevant or crucial to the defense strategy at trial.

Boyer was called as a defense witness and did testify at trial.  Contrary to Hyman's argument, defense counsel elicited sufficient, relevant and admissible testimony from Boyer in support of his self-defense claim.  Boyer provided testimony that in the hours leading up to the shooting she heard the victim tell Hyman he was waiting at Hyman's house with a gun.[41] She also testified that the victim was into guns.[42] Finally, she testified that Hyman told her that he saw the victim lifting his shirt and that he believed the victim was pulling out a gun.[43] Given that Boyer was able to testify to the victim's specific gun threats made directly to Hyman in this very case, it was not unreasonable for defense counsel not to elicit additional (and quite likely inadmissible) testimony from her or Bach regarding either the victim's general reputation for violence or significantly attenuated incidents that occurred in the past involving Hyman's purported use of violence or guns.  In fact, the state district court determined that evidence of the victim's purported dangerous character would have been inadmissible in any

---

[41] State Rec., Vol. 7 of 10, p. 866-67.

[42] *Id.* at 877.

[43] *Id.* at 869, 874.

event under state law and this Court does not sit to second-guess the state courts'
interpretation of state law on federal *habeas* review. *Dickerson v. Guste*, 932 F.2d 1142, 1145
(5th Cir.1991) ("We will not review a state court's interpretation of its own law in a federal
habeas corpus proceeding. We do not sit as a 'super' state supreme court in such a proceeding
to review errors under state law." (internal citation and quotation marks omitted)).

Hyman has plainly failed to demonstrate that prejudice resulted. To make this showing,
he must point to evidence in the record demonstrating that further investigation or more
vigorous questioning of the witnesses would actually have revealed additional information
beneficial to the defense. *See Moawad v. Johnson*, 143 F.3d 942, 948 (5th Cir.1998); *see also
Brown v. Dretke*, 419 F.3d 365, 375 (5th Cir.2005); *Wilson v. Cain*, Civ. Action No. 06–890, 2009
WL 2163124, at *22 (E.D.La. July 16, 2009), *aff'd*, 641 F.3d 96 (5th Cir.2011); *Davis v. Cain*, Civ.
Action No. 07–6389, 2008 WL 5191912, at *10 (E.D.La. Dec.11, 2008). Hyman has not shown
that any such beneficial information would have been revealed sufficient to undermine
confidence in the outcome of this case. To the contrary, the affidavits submitted by Boyer and
Bach showed that the additional testimony would have been cumulative and added nothing
of value.

Next, the Court considers Hyman's assertion that his attorney was ineffective because
he conducted an inadequate pretrial investigation into his claim that Kevin Bradley – a mutual
friend of the victim, Joshua Daigrepont and Hyman – confided to Hyman during a telephone
conversation that he witnessed Mr. Daigrepont "remove an object from the victim's person

42

mere seconds after the shooting and stow the indeterminate object nearby."[44] As to this claim, however, Petitioner has failed to establish either deficient performance or prejudice.

Hyman admits that Bradley has consistently denied Hyman's account of the events. He concedes Bradley made no such statements to police detectives or to the defense's private investigator during the course of the investigation.[45] Thus, it is clear that defense counsel investigated Bradley as a potential witness as Hyman requested. However, Bradley simply did not confirm Hyman's account. Petitioner's own assertions therefore seemingly contradict his allegation that counsel failed to investigate and procure favorable evidence.

Hyman's complaint is actually that his counsel did not conduct a more vigorous investigation into Hyman's allegations regarding Bradley's purported statement. That is, when Bradley denied making the statement that Hyman attributes to him, he argues that defense counsel should have complied with Hyman's request to "subpoena the electronically-surveilled telephone records likely maintained by the Jefferson Parish Sheriff's Office."[46] According to Hyman, "[w]ith potential impeachment evidence in hand, Bradley could become an effective defense witness compelled to offer testimony and admit and explain for the jury his prior

---

[44] Rec. Doc. 1-1, Memorandum in Support, p. 25.

[45] *Id.*

[46] *Id.*

43

statements to Petitioner."[47]  With such evidence, Hyman contends Bradley would have corroborated his account that the victim had a gun and Hyman shot him in self-defense.  The state district court rejected this claim as purely speculative and conclusory.  Hyman has not established that this decision is contrary to or an unreasonable application of established federal law.

"[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 690-91, 104 S.Ct. 2052.  "[C]ounsel is entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Garza v. Stephens*, 738 F.3d 669, 680 (5th Cir.2013), quoting *Richter*, 131 S.Ct. at 789.

Hyman's attorney had no grounds, much less an obligation, to pursue additional investigation to uncover "impeachment evidence" simply because Bradley denied Hyman's account.  Hyman's assertion that recordings of phone conversations would have provided evidence that Bradley saw Daigrepont remove an object from the victim and hide the object is entirely speculative and unsupported.  Furthermore, the fact that Bradley consistently

---

[47] *Id.*

denied the account, Hyman's vague assertions as to what Bradley allegedly saw, and the sheer scope of the request for telephone records – spanning more than two years– militates against Hyman's suggestion that any beneficial evidence would have been located.[48]   Hyman's argument falls well short of proving the existence of exculpatory evidence that would have been found through further investigation.  It is not the province of the federal court on *habeas* review to conduct a fact-finding mission to uncover non-record support for a Petitioner's *habeas* claims.  This Court is limited to the record as it was before the state courts when the merits of the claims were addressed. *Cullen v. Pinholster*, 131 S.Ct. 1388, 1398 (2011).

Hyman has brought forth no evidence establishing that there is a reasonable probability that further investigation would have revealed any information which, if it had been discovered and presented at trial, would have resulted in a different outcome at trial.  The evidence presented at trial overwhelmingly showed that the victim was not armed on the day of the incident.  The reluctant testimony of an impeached defense witness denying that he saw Daigrepont remove an "unidentified" object from the victim on the day in question would not have changed the result in this case.  Hyman cannot make the required showing that he was prejudiced by the allegedly inadequate investigation and his claim necessarily fails.

---

[48] Counsel for Petitioner on post-conviction review filed a "Motion for the Issuance of a Subpoena Duces Tecum," seeking from the Jefferson Parish Correctional Center any and all telephone call recordings and printouts of numbers, incoming and outgoing, for Hyman during the entire period of his incarceration beginning on or about "August 7, 2006 and continuing thereafter."  State Rec., Vol. 2, Tab 4.

Consequently, Hyman has failed to demonstrate that the state court's decision rejecting his ineffective assistance of counsel claims was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Thus, under the AEDPA's doubly deferential standard applicable to ineffective assistance claims, the claims should be rejected.

## RECOMMENDATION

**IT IS RECOMMENDED** that Hyman's application for federal *habeas corpus* relief be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir.1996) (*en banc*).[49]

New Orleans, Louisiana, this  6th  day of _____ April _____ 2015.

_____
**MICHAEL B. NORTH**
**UNITED STATES MAGISTRATE JUDGE**

---

[49]   *Douglass* referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.